IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF SYLVIA BYRD JONES, by | ) | |
| and through the administratrix | ) | |
| of the estate, JAMILLA FOSTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-cv-30-TMP |
| | ) | |
| LT. ERIC STARR and JOHN GARLICK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This action, arising from 42 U.S.C. § 1983, is before the court on the motion for summary

judgment filed December 15, 2010, by the defendants, Eric Starr and John Garlick.[1] Defendants seek

dismissal of plaintiff's sole claim: that the defendants were deliberately indifferent to the serious

medical needs of Sylvia Byrd Jones, and that she died as a result of their inaction, all in violation of

her rights under the United States Constitution.  This matter has been fully briefed.  The court has

considered the pleadings, evidence, and arguments set forth by both parties.  The parties have

consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).

---

[1]    The claim against a third defendant, Sheriff Larry Amerson, already has been
dismissed by consent.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party is unable to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting former Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessarily admissible at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts

Case 1:10-cv-00030-TMP   Document 26   Filed 05/25/11   Page 4 of 18

are the function of the jury, and therefore the evidence of the non-movant is to be believed and all

justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need

not be given the benefit of every inference but only of every reasonable inference.  Brown v. City

of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).


**FACTS**

Plaintiff, the estate of Sylvia Byrd Jones,[2] brought this action through the administratrix of

the estate, Jamilla Foster, who is Ms. Jones' daughter. The complaint alleges that the defendants "did

with deliberate indifference fail to meet the serious medical needs of the deceased, Sylvia Denise

Byrd Jones, while she was incarcerated in the Calhoun County Jail." (Complaint, Count I, ¶ 2).  The

plaintiff further asserts that the defendants "did fail to seek appropriate medical treatment for the

deceased ... even after being informed by family members that they were being informed that Ms.

Jones was lying in her own waste, was not eating or responding." (Complaint, Count I, ¶ 3).  Finally,

the Complaint asserts that Ms. Jones died as a "direct and proximate result of the Defendants'

actions." (Complaint, ¶ 5).  There is no dispute that the only damages available to the estate, as

plaintiff, are those arising from the death of Ms. Jones.[3]

_____

[2]        The briefs refer at times to the decedent as Ms. Byrd, but because of the caption of
the case and to avoid confusion between the decedent and her daughter, Shonda Byrd, the court
refers to the decedent as Ms. Jones.


[3]        The Eleventh Circuit's recent decision in Estate of Gilliam ex. rel. Waldroup v. City
of Prattville, ___ F.3d ___, 2011 WL 1544818 (11th Cir., April 26, 2011), makes plain that the only
claim asserted in this action is one alleging that the defendants' deliberate indifference caused the
death of the decedent. Any claim the decedent might have had for pain, suffering, and the lack of
medical treatment occurring prior to her death does not survive her death.  Under Ala. Code § 6-5-

Plaintiff does not dispute any of the facts set forth in the defendant's brief in support of the motion for summary judgment, but contends that the facts demonstrate that defendants acted with deliberate indifference to Ms. Jones' medical needs in that "[f]or at least several hours, if not an additional day after [Ms. Roberts'] conversation with Mr. Garlick, Ms. [Jones] was left in an unconscionable condition." (Plaintiff's Response, Doc. 24, p. 2). The court has reviewed all of the evidence and exhibits and concludes that the facts are essentially undisputed. The following is a synopsis of the facts, which the court views in the light most favorable to the plaintiff.

Ms. Jones had a history of paranoid schizophrenia, crack cocaine abuse, and colon cancer. She moved to Anniston in 2005 after she had undergone surgery to treat her colon cancer. She did not seek any medical treatment for the cancer after returning to Alabama, and did not appear to suffer from any symptoms of the cancer. She did continue to have mental health problems, but family members do not believe that she continued taking medications that had been prescribed to treat her mental illness. When not taking her medications, the plaintiff was prone to unstable and aggressive behavior, and she "heard voices" and "saw things." (Depo. of J. Foster, p. 48, attached to Doc. 22 as Ex. A). She was arrested on several occasions while living in Anniston.

On December 15, 2007, Ms. Jones stabbed her daughter, Jamilla Foster, with a kitchen knife. Ms. Foster suffered facial fractures, two black eyes, and cuts and bites on her arm as a result of the

---

462 (1975), a claim for pain, suffering, and denial of medical treatment accruing before the death of the decedent abates with the death, unless suit is already filed on the claim at the time of death. If suit has not been filed at the time of death, the action does not survive the death. However, where it is alleged that the constitutional violation *caused* the death, a claim would under Alabama's wrongful death statute, Estate of Gilliam, *supra* at *4 n. 9, but only for the death itself, not the pre-death pain and suffering.

attack.  She called the police to the scene.  Ms. Jones was charged with assault in the second degree, a felony.  Her bond was set at $2500.

Both Ms. Foster, and Ms. Jones' other daughter, Shonda Byrd, attended a bond hearing after the arrest.  They met with an assistant district attorney and with Ms. Jones' court-appointed defense attorney.  Ms. Foster told the two attorneys that she wanted her mother to "get help," and left the meeting with the impression that her mother would be sent to Taylor Hardin, a correctional facility that provides treatment for psychological disorders.  Ms. Foster has testified that she felt her mother might be safer in jail than if she were released.

Ms. Jones was booked into the Calhoun County Jail on December 18, 2006.  Neither she nor any of her family members reported any physical or mental health problems to any jail official or employee.  She did report a family history of several illnesses.  She did not indicate to jail officials that she was taking any medications at the time of her arrest.  In the routine medical screening that is conducted before an inmate is taken into the jail, it was noted on the form that Ms. Jones appeared to have psychiatric problems.  Ms. Jones indicated that she did not have any medical issues that required attention, and that she had not recently been hospitalized.

Ms. Jones was housed in a cell alone because she did not get along with other inmates, although she did not present any discipline problems while in jail.  During her months of incarceration, Ms. Jones occasionally sought treatment for a medical need by using the jail's procedures.  Two nurses are employed at the jail, and they are present from 8:30 a.m. until 4:30 p.m. Mondays through Fridays.  Doctors are hired on a contract basis to provide care as needed.  The jail operates a "sick call" process, in which inmates can report an illness or health problem.  One of the

nurses makes an initial evaluation of the medical condition of the inmate, and may then refer the inmate to a doctor. According to the jail file, which includes a record of each inmate's request for medical attention, Ms. Jones first submitted a request for aid on January 8, 2007, when she complained of acid reflux. She was given Zantac to treat the problem. On May 22, 2007, Ms. Jones again sought medical treatment by filling out the requisite form. She complained of stomach pains, and was seen the next day during sick call. She was given Docustate and Phenergan to treat her symptoms. She sought further treatment for stomach distress on May 23, 2007, and was given Docustate and Phenergan again. She sought assistance again on October 4, 2007, when she complained of sinus pressure and drainage, acid reflux, and generalized pain. She was given an antibiotic, Tylenol, and a medication for the sinus drainage. There is no record, and no allegation, that Ms. Jones sought treatment, or made any complaints regarding any medical need, after October 4, 2007.

In January 2008, Ms. Jones' family members became concerned about Ms. Jones' health after receiving telephone calls from jail inmates.[4] Ms. Byrd received a telephone call from Kandria Lewis, an inmate in the Calhoun County Jail. Ms. Lewis told Ms. Byrd that Ms. Jones was sick and that the

---

[4]     The plaintiffs have failed to offer any definitive evidence concerning the date that the phone calls began. Sara Ross Roberts, Ms. Jones' aunt, testified: "I don't remember the month. But it wasn't cold. Of course, down here it don't get that cold. ... I don't remember the dates and things like that." (Depo. of S. Roberts, p. 22, attached to doc. 22 as Ex. E). Ms. Roberts did confirm that the calls occurred over the course of two days. (Id. at p. 30). Other testimony indicates that the phones calls began on a Wednesday in early January 2008. (Depo. Of S. Byrd, pp. 29-31). According to the testimony of Ms. Foster, the phone calls occurred over "several days," and the first phone call came "on a Monday, January – I want to say the 10th to be exact." (Depo. of J. Foster, p. 87, attached to doc. 22 as Ex. A).

family needed to come to the jail to check on her.  No earlier than January 7, 2008,[5] Ms. Foster

received a telephone call from Ms. Lewis, in which Ms. Lewis said that there were "food trays

everywhere" in Ms. Jones' cell, and that Ms. Jones was "laying there and she's not moving, and

she's laying in her own urine and feces."  (Depo. Of J. Foster, p. 86, attached to Doc. 22 as Ex. A).

Ms. Byrd visited Ms. Jones the same day that she received the first phone call alerting her that Ms.

Jones was ill.  Sara Ross Roberts, Ms. Jones' aunt, also received similar calls, and spoke with an

inmate named Belinda Hardiman.

Although the deposition testimony does not clearly define who called or when the calls were

made, a reading of the evidence in the light most favorable to the plaintiff makes clear that Ms.

Jones' family members received multiple calls conveying similar information from two or three

inmates in the course of a couple of days in early January.[6]  The inmates indicated that they had not

told jail officials about Ms. Jones because they didn't think it would do any good.

In response to the phone calls alerting them that Ms. Jones was ill, family members began

to make calls to the sheriff's office.  On the day that Ms. Byrd received the first call from Ms. Lewis,

she contacted the county sheriff and set up an appointment to visit the jail.  She visited with Ms.

---

[5]        The first Monday in January of 2008 was January 7, 2008.  Although Ms. Foster believes it was January 10, that date was a Thursday.  Accordingly, it appears that the best estimate of the date of the call to Ms. Foster, viewing Foster's testimony in the light most favorable to the plaintiff, is January 7.

[6]        Viewing the evidence in the light most favorable to the plaintiff, the earliest that any inmate called to report that Ms. Jones was ill was Monday, January 7, 2008.  It is undisputed that family members visited Ms. Jones on Wednesday, January 9, 2008.  It further is undisputed that Ms. Jones was taken to the doctors' office on January 10, 2008, and then to the hospital, where she died on January 12, 2008.

Jones that same evening, around 6 or 7 p.m.[7]  Upon arriving at the jail, Ms. Byrd observed that Ms.

Jones was in a wheelchair and was talking, but was slurring her words.  She took pictures of Ms.

Jones and showed them to Ms. Foster.

On the day that Ms. Roberts received the first call, she went to the sheriff's office and first

met with defendant Garlick.  He told her that it was not his job and that he couldn't do anything

about Ms. Jones' condition.[8]  Ms. Roberts immediately knew she should talk to the sheriff.  She

talked with the sheriff, who told her he would look into the situation.  After they talked to the sheriff

"things began to happen," according to Roberts, who says that Ms. Jones was "cleaned up," and put

into a wheelchair and allowed to visit with her family members.

Ms. Foster has testified that on the day she received a phone call from Ms. Lewis, she called

the jail and spoke with defendant Starr.  Lt. Starr told her that there was no one at the jail as sick as

the descriptions that had been given of Ms. Jones.  After seeing pictures of Ms. Jones, Ms. Foster

telephoned one of the jail nurses the next day, which was Thursday, January 10, 2008.  The nurse

told her that Ms. Jones would be seen by a doctor that day.

On January 10, 2008, Ms. Jones was taken to the Anniston Family Practice offices – offices

for doctors who are under a contract with the jail – and was seen by a doctor.  She reported

---

[7]     Foster's testimony and Ms. Byrd's testimony differ slightly as to whether the appointment was on a Tuesday or a Wednesday, but it is clear that the phone calls began no earlier than Monday, and that the visit occurred no later than Wednesday.

[8]     According to Ms. Byrd, defendant Garlick talked with the family members on the day after the jail visit, which would have been Thursday, and Sgt. Garlick told them that Nurse Brent Cobb was the person they should speak with about Ms. Jones' medical condition.  The testimony of the three women makes clear that on Thursday they did speak with Mr. Cobb, who assured them that Ms. Jones would see a doctor that day – and she did.

headaches, and described the pain as "moderate" and "aching." The medical records indicate that she had recently taken Tylenol for the headaches. She was admitted to the local hospital that same day. She was responsive when taken to the emergency room; however, she fell into a coma shortly after being admitted, and was diagnosed with a brain tumor. She died on January 12, 2008.

At the time immediately preceding Ms. Jones' death, Lt. Starr was a Corrections Lieutenant, responsible for overseeing the day-to-day operations of the jail. He did not have any duties specifically related to inmates who were in need of medical care, but he was responsible for inspecting the jail and observing inmates. He does not recall any contact with Ms. Jones. Conditions like a collection of food trays in a cell are not allowed under jail policy, and Lt. Starr does not know of any instance in which that situation existed.

At the time of Ms. Jones' death, defendant Garlick was a sergeant working for the county sheriff, and was also the mental health officer. He does not recall meeting with any of Ms. Jones' family members. He did not ever meet with Ms. Jones or refer her to any mental health facility.

## DISCUSSION

The plaintiff's sole claim is that the defendants violated Ms. Jones' constitutional rights in that they were deliberately indifferent to Ms. Jones' serious medical needs, and that Ms. Jones died as a result of the defendants' inaction.[9] The Complaint alleges that the defendants failed "to seek

---

[9]   The plaintiff's claim arises under the Fourteenth Amendment rather than the Eighth Amendment because Ms. Jones was a pre-trial detainee. Andujar v. Rodriguez, 486 F.3d 1199, 1203 n. 3 (11th Cir. 2007). An evaluation of the claims under either amendment, however, is identical, and cases analyzing such claims may be used "interchangeably." McDaniels v. Lee, 405 Fed. Appx. 456, 458 (11th Cir. 2010).

appropriate medical treatment" for Ms. Jones, even after being informed by Ms. Jones was lying in her own waste and was not responsive.  The defendants seek summary judgment in their favor, asserting that they are entitled to qualified immunity.

### A.  Qualified Immunity

Under federal law, it is well settled that qualified immunity protects government officials performing discretionary functions from civil suit, and from liability, where their conduct does not violate "clearly established statutory or constitutional rights."  Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).  The shield of qualified immunity has been expanded to include acts that may not involve the exercise of "actual discretion," and can include acts that may be ministerial but are "job-related functions" and are through means that are within the official's authority to utilize.  Holloman v. Harland, 370 F.3d 1252, 1265-66, (11ᵗʰ Cir. 2004), quoting Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1185 n. 17 (11ᵗʰ Cir. 1994).  Qualified immunity may be applied to sheriff's deputies.  Townsend v. Jefferson County, 601 F.3d 1152 (11ᵗʰ Cir. 2010).

The Supreme Court recently re-articulated the standard for a qualified immunity analysis, stating that "qualified immunity balances two important interests, the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  Under Pearson, the court must grant qualified

immunity unless the plaintiff can demonstrate: first, that the facts viewed in the light most favorable

to the plaintiff establish a constitutional violation by the officers, and second, that it was clearly

established at the time of the incident that the actions of the defendant were unconstitutional. 129

S. Ct. at 814-15, 817-18.[10]  Furthermore, it is the general rule that qualified immunity will protect

government actors from liability, and only in "exceptional cases" will the immunity be unavailable

as a shield.  Harris v. Board of Educ. of Atlanta, 105 F.3d 591, 595 (11th Cir. 1997).

The initial burden of demonstrating that the public official is acting within the scope of his

position lies with the defendant asserting that defense.  Holloman, 370 F.3d at 1264. In this case, the

plaintiff does not dispute that the defendants were acting within the scope of their authority as jail

officials.

Once the defendant has met that burden, the burden shifts to the plaintiff to show that the

defendant is not entitled to qualified immunity.  370 F.3d at 1264.  To prevail against an assertion

of qualified immunity, the plaintiff must demonstrate that: "(1) the defendant violated a

constitutional right, and (2) this right was clearly established at the time of the alleged violation."

370 F.3d at 1264, citing Wilson v. Layne, 526 U.S. 603, 609, 199 S. Ct. 1692, 1697, 143 L. Ed. 2d

818 (1999).

---

[10]     Pearson further holds that the court is no longer required to perform a qualified immunity analysis in the order stated in Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), and instead is "permitted to exercise sound discretion" in whether the first or second prong is looked at first. Pearson, 129 S. Ct. at 818.

### B. Deliberate Indifference

A plaintiff alleging deliberate indifference must demonstrate that she suffered an "objectively serious medical need and that a defendant acted with deliberate indifference to that need." Burnette v. Taylor, 533 F.3d 1325, 1330 (11th Cir. 2008). The elements of a claim for deliberate indifference under the Fourteenth Amendment are that the defendants "(1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence. Harper v. Lawrence County, Alabama, 592 F.3d 1227, 1234 (11th Cir. 2010), citing Burnette, 533 F.3d at 1330. In addition, the plaintiff must demonstrate that the defendants' conduct caused the injury, which, in this case, is the death of the decedent.[11] Mann v. Taser International, Inc., 588 F.3d 1291, 1306–07 (11th Cir. 2009).

In order to show the requisite "disregard" for the risk of harm, which is central to a claim of deliberate indifference, "the plaintiff must show: '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence.'" Thomas v. Harris, 399 Fed. Appx. 508, 510, (11th Cir. 2010, quoting Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir.

___

[11] The defendants contend that an action brought by an executor of an estate in a § 1983 case may seek damages for the wrongful death of the decedent, and not for pain and suffering, because the damages available are governed by state law. See King v. National Spa and Pool Institute, Inc., 607 So. 2d 1241 (Ala. 1992). However, in Estate of Gilliam v City of Prattville, ___ F.3d ___, 2011 WL 1544818, (11th Cir., April 26, 2011), the Eleventh Circuit stressed that, "While it is clear that a § 1983 claim alleging that a constitutional violation caused the decedent's death can be asserted through the Alabama wrongful death statute, the kinds of damages that are recoverable are determined by federal law." Id. at ___, 2011 WL 1544818, *4 n. 9, citing Gilmere v. City of Atlanta, Ga., 864 F.2d 734, 739 (11th Cir.1989). As discussed infra, however, even if such pre-death injuries were compensable to the estate, there is no evidence (except the completely inadmissible double hearsay of what family members say that inmates said) that Ms. Jones suffered these particular injuries.

13

2004).  The Supreme Court noted in Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994), that the plaintiff must show both that the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Imputed knowledge of the risk of serious harm is not sufficient as a basis for a claim of deliberate indifference.  Burnette, 533 F.3d at 1331.  Additionally, collective knowledge does not form the basis for such a claim, and "[e]ach individual Defendant must be judged separately and on the basis of what that person knows."  533 F.3d at 1331.  There is no liability under the Constitution for an "official's failure to alleviate a significant risk that he should have perceived but did not."  Farmer, 511 U.S. at 837.

In this case the parties do not dispute that Ms. Jones, whose brain tumor was discovered two days before her death, suffered from an objectively serious medical condition.[12]  The central issues raised by the motion for summary judgment are whether the requisite causation existed between the acts or omissions of the defendants and her death, and whether the defendant knew of the risk of plaintiff's death and disregarded it.

### A.  Causation

Defendants assert that there exists no material issue of genuine fact as to whether any action or inaction of the defendants caused the death of Ms. Jones.  In the response to the motion, the

---

[12]      Because the parties do not argue this point, the first element of "serious medical need" will not be discussed in depth.  However, that term has been defined as "one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment."  Burnette, 533 F.3d at 1330, citing Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003).  At the time that plaintiff alleges a denial of medical care, Ms. Jones did not have any diagnosis of a brain tumor, and it is less than clear that a lay person would find the existence of a brain tumor to be "obvious."

plaintiff concedes that "there is no medical evidence that the defendants, through their actions, caused the death" of Ms. Jones.  (Plaintiff's brief, doc. 24, p. 5).[13]  This concession, alone, compels the conclusion that the motion for summary judgment is due to be granted in favor of the defendants. See Estate of Gilliam, *supra.*

### B.  Deliberate Indifference

To evaluate any defendant's culpability under the deliberate indifference standard, the court must determine both what any defendant knew about Ms. Jones's condition, and whether any defendant actually inferred from those facts that the plaintiff was at a substantial risk of serious harm.  The "facts" plaintiff points to are the reports by inmates that Ms. Jones was unresponsive, not eating, and lying in her own waste.  None of the evidence, however, indicates that these inmates reported this alleged condition to any jail official, much less to either of the two defendants in this case.  Moreover, while the content of the phone calls to Ms. Byrd, Ms. Foster, and Ms. Roberts may be admissible for the purpose of showing what prompted these three women to contact the jail and the sheriff, the facts alleged — that Ms. Jones was unresponsive, not eating, and lying in her own waste — are clearly hearsay and would be inadmissible at trial to prove the truth about Ms. Jones's actual condition at the jail.[14]  Furthermore, neither defendant recalls any conversation with or contact with Ms. Jones or her family.  While both defendants indicate that, if an inmate had been as ill as

---

[13]     There has been no medical evidence from which any inference can be drawn that, if Ms. Jones had received treatment a day or two earlier than she did, she would not have died.  Neither is there any evidence that "a physician would have diagnosed [the decedent's] injury based on [her] symptoms."  Johnson v. McNeil, 278 Fed. Appx. 866 (11th Cir. 2008).

[14]     The court could consider such evidence had it been reduced to an affidavit by an inmate or some other form, but as the record in this case stands, the plaintiff's proof is simply what the family members *say* they *were told* by others in telephone calls.

Ms. Jones is now described as being, it probably would have come to their attention.  All of the evidence presented to the court at this point indicates either that Ms. Jones did not exhibit the dramatic symptoms that the inmates described to family members, or that, if she did, the two defendants were unaware of it.[15]   In any event, there is absolutely no evidence that the two defendants were aware, or should have been aware, that Ms. Jones had a brain tumor in need of medical treatment.  The cause of her death was the brain tumor, and a claim for deliberate indifference to her serious medical needs requires proof that the defendants knew a brain tumor threatened her life and did nothing about it.

Ms. Jones' family members have provided evidence that Ms. Jones looked puny and was in a wheelchair during a visit on January 9, 2008.  Ms. Jones reported to family members only that she wanted money to pay for Tylenol.  While the family members clearly were concerned about Ms. Jones' health, they did not find any "obvious" signs that Ms. Jones was suffering from a brain tumor.  It is undisputed that Ms. Jones was taken to the doctor the next day.  Even the medical personnel at the doctor's office did not recognize the severity of her medical condition.  Even if the defendants should have recognized Ms. Jones' illness, there is simply no evidence that they did.  See, *e.g.*, Walker v. Huntsville, 310 Fed. Appx. 335, 339 (11th Cir. 2009)(holding that "mistakenly failing to identify a brain aneurysm is not deliberate indifference," even if it was "negligent of the officers or the jailers not to provide [plaintiff] with more intensive medical care.").

---

[15]      It could be argued that the defendants negligently failed to inspect the jail adequately and thus failed to see Ms. Jones' distress.  As noted *supra*, however, even gross negligence is not sufficient to sustain a claim of deliberate indifference.

1. Defendant Garlick

Defendant Garlick does not recall having any interaction with Ms. Jones, and there is no evidence otherwise.  The only evidence that he played any role in Ms. Jones' medical care is that he met with Ms. Roberts when she came to see the sheriff.  He told her that it was "not his job" to provide any medical care.  Shortly after Sgt. Garlick met with Ms. Roberts, the sheriff met with Ms. Roberts, and Ms. Jones began to get care.  Within hours or a day after that meeting, Ms. Jones was seen by a doctor.[16]  The plaintiff has simply failed to offer any evidence that Sgt. Garlick was deliberately indifferent to Ms. Jones' illness, or that any deliberate indifference he may have exhibited caused her death.

2. Defendant Starr

Defendant Starr similarly has no recollection of having met with or interacted with Ms. Jones while she was incarcerated.  As jail administrator in January 2008, Lt. Starr does admit that he was responsible for inspecting the jail, and that the collection of food trays was one of the conditions for which he would inspect the jail.  Plaintiff's contention that Starr acted with deliberate indifference toward Ms. Jones' medical need is premised upon the "fact" that food trays had piled up in her cell, and that she was, in fact, lying unresponsive in her own waste.  Again, the plaintiff has failed to produce any evidence that such a condition actually existed.  To the contrary, the only facts regarding

---

[16]    The plaintiff makes much of the fact that Ms. Jones was not receiving any mental health counseling and/or was not sent to Taylor Hardin for a mental evaluation.  There is no evidence, however, that failure to receive treatment for any mental illness had any effect on Ms. Jones' brain tumor or contributed to her death.

Ms. Jones' condition are that she "looked different" than she had when she went to jail more than a year earlier, and that her family members thought she appeared very ill.  Even if the plaintiff had produced evidence that Ms. Jones was lying in her cell in an abhorrent condition for two days, there is no evidence that Starr knew of Ms. Jones' condition, or that this would have revealed to him the need to obtain medical treatment for a brain tumor.  Even if he should have known, and even if he acted with gross negligence, his conduct cannot be deemed to have been deliberately indifferent absent some showing that he actually knew Ms. Jones was terribly ill.  For these additional reasons, the motion for summary judgment is due to be granted as to defendant Starr.

<u>CONCLUSION</u>

Based on the foregoing undisputed facts and legal conclusions, the court finds that the motion for summary judgment filed by the defendants (doc. 21) is due to be granted and the plaintiff's claims are due to be dismissed with prejudice.  A separate order will be entered in accordance with the findings set forth herein.

DATED this 25th  day of May, 2011.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE